No. 22-12719

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

3M COMPANY, *et al.*

*Defendants-Appellants*,

v.

STEVEN WILKERSON,

*Plaintiff-Appellee.*

———————————

On Appeal from the United States District Court
for the Northern District of Florida
Nos. 3:19-md-2885, 7:20-cv-35

———————————

## BRIEF FOR DEFENDANTS-APPELLANTS

———————————

GEORGE W. HICKS, JR.
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000

PAUL D. CLEMENT
  *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

COLE CARTER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Counsel for Defendants-Appellants*

November 8, 2022

No. 22-12719, *3M Company, et al. v. Wilkerson*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellants 3M Company, 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC hereby certifies that the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

- 3M Company (MMM) – Defendant-Appellant

- 3M Occupational Safety LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Holdings LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Intermediate LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Technologies LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo, LLC – wholly owned subsidiary of Defendant-Appellant 3M

No. 22-12719, *3M Company, et al. v. Wilkerson*

Company

- Aylstock Witkin Kreis & Overholtz – counsel for Plaintiff-Appellee

- Aylstock, Bryan Frederick – counsel for Plaintiff-Appellee

- Barr, Brian H. – counsel for MDL Plaintiffs

- Beall, Charles Franklin, Jr. – counsel for Defendants-Appellants

- Benton, Diana Clough – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Bhimani, Jay L. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Bouk, Winston Troy – counsel for MDL Plaintiffs

- Bradley Arant Boult Cummings – counsel for Defendant-Appellant 3M Company

- Branscome, Kimberly O. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Brock, Robert C. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

No. 22-12719, *3M Company, et al. v. Wilkerson*

- Brown & James – counsel for Plaintiff-Appellee

- Buchanan, David R. – counsel for Plaintiff-Appellee

- Burns, Michael A. – counsel for MDL Plaintiffs

- Buxner, Evan D. – counsel for MDL Plaintiffs

- Cantero, Raoul G. – counsel for Defendant-Appellant 3M Company

- Carter, Cole T. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Cartmell, Thomas P. – counsel for MDL Plaintiffs

- Castiglia, Craig – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Ciresi Conlin LLP – counsel for Plaintiff-Appellee

- Clark Love & Hutson – counsel for Plaintiff-Appellee

- Clement, Paul D. – counsel for Defendants-Appellants

- Clement & Murphy, PLLC – counsel for Defendants-Appellants

- Cooper, David M. – counsel for Plaintiff-Appellee

- Cornell, Katherine Lindsey – counsel for MDL Plaintiffs

- Czak, Steven C. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo

No. 22-12719, *3M Company, et al. v. Wilkerson*

Technologies LLC, and Aearo, LLC

- Dechert LLP – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- De Paulo, Tabitha J. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Elizabeth, Sierra – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Ellis, Robert P. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Esfandiarifard, Saghar – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Fields, Barry E. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Fox, Shawn – counsel for Plaintiff-Appellee

No. 22-12719, *3M Company, et al. v. Wilkerson*

- Glass, David M. – counsel for the United States of America

- Gori Julian & Associates – counsel for MDL Plaintiffs

- Gottlieb, Simon – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Gunderson, Karl B. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Hicks, George – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Hill, Thomas Larry – counsel for Defendants-Appellants

- Hodge, Leigh Anne – counsel for Defendant-Appellant 3M Company

- Hoekstra, Jennifer M. – counsel for MDL Plaintiffs

- Hutson, Shelley Van Natter – counsel for Plaintiff-Appellee

- Jones, Hon. Gary R. – U.S. Magistrate Judge for the Northern District of Florida

- Karis, Hariklia – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

No. 22-12719, *3M Company, et al. v. Wilkerson*

- Kelly, Maxwell H. – counsel for Plaintiff-Appellee

- Kim, Mary H. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Kirkland & Ellis LLP – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Kolsky, Joshua M. – counsel for the United States of America

- Kreis, Douglass A. – counsel for Plaintiff-Appellee

- Laminack Pirtle & Martines – counsel for MDL Plaintiffs

- Lauria, Jessica C. – counsel for Defendant-Appellant 3M Company

- Leach, Garret A. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Leuthauser, Nolan M. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Levin Papantonio Rafferty – counsel for MDL Plaintiffs

- Marlowe, Emily B. – counsel for Plaintiff-Appellee

- Mitchell, Kasdin – counsel for Defendants-Appellants 3M Occupational

No. 22-12719, *3M Company, et al. v. Wilkerson*

Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo

Technologies LLC, and Aearo, LLC

- Morriss, F. Chadwick – counsel for Defendants-Appellants 3M

  Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC,

  Aearo Technologies LLC, and Aearo, LLC

- Mostyn Law – counsel for MDL Plaintiffs

- Moore Hill & Westmoreland – counsel for Defendants-Appellants

- Murphy, Erin E. – counsel for Defendants-Appellants

- Neglia, Ashley E. – counsel for Defendants-Appellants 3M Occupational

  Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo

  Technologies LLC, and Aearo, LLC

- Nomellini, Mark J. – counsel for Defendants-Appellants 3M Occupational

  Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo

  Technologies LLC, and Aearo, LLC

- Odom, Megan L. – counsel for Plaintiff-Appellee

- Onder Law LLC – counsel for MDL Plaintiffs

- Ozurovich, Allison K. – counsel for Defendants-Appellants 3M

  Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC,

  Aearo Technologies LLC, and Aearo, LLC

- Pirtle, Thomas W. – counsel for MDL Plaintiffs

No. 22-12719, *3M Company, et al. v. Wilkerson*

- Pulaski Law Firm – counsel for MDL Plaintiffs

- Quinn Emanuel Urquhart & Sullivan LLP – counsel for Plaintiff-Appellee

- Rafferty, Troy Alan – counsel for MDL Plaintiffs

- Rivera, Maria P. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Rodgers, Hon. M. Casey – U.S. District Judge for the Northern District of Florida

- Sacchet, Michael A. – counsel for Plaintiff-Appellee

- Seeger, Christopher A. – counsel for MDL Plaintiffs

- Seeger Weiss LLP – counsel for Plaintiff-Appellee

- Seeley, Caleb A. – counsel for Plaintiff-Appellee

- Steinberg, Matthew P.  – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Tam, Jonathan S.  – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- Tracey Fox King & Walters – counsel for Plaintiff-Appellee

- Tracey, Sean Patrick – counsel for Plaintiff-Appellee

No. 22-12719, *3M Company, et al. v. Wilkerson*

- Van Fleteren, Haley J. – counsel for Defendants-Appellants

- Wagstaff & Cartmell – counsel for MDL Plaintiffs

- Wasdin, Nicholas F. – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

- White & Case – counsel for Defendant-Appellant 3M Company

- Wilkerson, Steven – Plaintiff-Appellee

- Wilson, Quinn Robert – counsel for MDL Plaintiffs

- Zanello, Lindsay N.  – counsel for Defendants-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC

Defendant-Appellant 3M Company states that it is a corporation whose shares are publicly traded (NYSE: **MMM**).  3M Company does not have a parent corporation and no publicly held corporation owns 10% or more of 3M's stock.

Defendant-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC state that they are wholly owned subsidiaries of Defendant-Appellant 3M Company.

November 8, 2022

<u>s/Paul D. Clement</u>
Paul D. Clement

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT................................................................CIP-1

TABLE OF AUTHORITIES.................................................................... iii

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION ........................................................ 3

STATEMENT OF THE ISSUES ............................................................ 3

STATEMENT OF THE CASE................................................................. 4

    A.    Factual Background........................................................... 4

        1.    The Military Concludes the CAEv2 Is "Protective up
            to 190 Decibels," and 3M Includes that Conclusion in
            a Brochure ............................................................... 5

        2.    Appellants Tested the CAEv2 and Found an NRR of
            22, which Was Corroborated by an Independent Lab............... 7

        3.    The Military Created a "Medical Procurement Item
            Description" with Technical Requirements for
            Competing Earplugs................................................... 9

    B.    Procedural Background .....................................................11

        1.    The District Court Permits Unsubstantiated
            Misrepresentation Claims to Proceed to Trial ..........................11

        2.    The District Court Prohibits Appellants' Witnesses
            From Discussing the Favorable Results From the
            Michael Laboratory Test ......................................... 13

        3.    Wilkerson's Trial.................................................... 16

            a.  Wilkerson Pursues Misrepresentation Theories Based
            on Statements He Never Received or Relied on.......................17

            b.  Wilkerson Capitalizes On Inadmissible Evidence.............23

4.    A Non-Presiding District Court Judge Denies Defendants' Motion for Judgment as a Matter of Law ............ 26

SUMMARY OF ARGUMENT ................................................................. 27

ARGUMENT ................................................................................. 30

I.    Wilkerson's Misrepresentation Claims Fail As A Matter Of Law Due To Insufficient Evidence That He Received Or Relied on False Statements From The Appellants ................................................. 30

II.    The District Court Erred By Prohibiting Kevin Michael And Eileen Kline From Testifying ................................................................. 40

III.    Numerous Evidentiary Issues Require A New Trial ...................................... 45

A.    Communications Regarding the Discontinuation of the CAEv2 Should Have Been Excluded ................................................. 46

B.    The *Qui Tam* Report Should Have Been Excluded ........................... 47

CONCLUSION ................................................................................. 48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

## Cases

*Boggan v. Data Sys. Network Corp.*,
  969 F.2d 149 (5th Cir. 1992) ................................................................. 36

*Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*,
  162 F.3d 653 (11th Cir. 1998) ............................................................... 29

*City of Tuscaloosa v. Harcros Chems., Inc.*,
  158 F.3d 548 (11th Cir. 1998) ............................................................... 30

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .............................................................................. 43

*Donlin v. Philips Lighting N. Am. Corp.*,
  581 F.3d 73 (3d Cir. 2009) .................................................................... 43

*Hennig v. Ahearn*,
  601 N.W.2d 14 (Wis. Ct. App. 1999) .................................................... 36

*In re Syngenta AG Mir 162 Corn Litig.*,
  2019 WL 4013962 (D. Kan. Aug. 26, 2019) ......................................... 32

*Lundin v. Shimanksi*,
  368 N.W.2d 676 (Wis. 1985) ................................................................. 32

*Malzewski v. Rapkin*,
  723 N.W.2d 156 (Wis. Ct. App. 2006) .................................................. 37

*Matamoros v. Broward Sheriff's Off.*,
  2 F.4th 1329 (11th Cir. 2021) ............................................................... 33

*Nebula Glass Int'l v. Reichhold, Inc.*,
  454 F.3d 1203 (11th Cir. 2006) ............................................................ 29

*Ramsden v. Farm Credit Servs. of N. Cent. Wis. ACA*,
  590 N.W.2d 1 (Wis. Ct. App. 1998) ...................................................... 32

---

[*] Citations upon which Appellants primarily rely are marked with asterisks.

iii

*Richards v. Michelin Tire Corp.*,
  21 F.3d 1048 (11th Cir. 1994) ................................................................. 39

*Royal Typewriter Co. v. Xenographic Supplies Corp.*,
  719 F.2d 1092 (11th Cir. 1983) ................................................................ 40

*Sinclair v. Long Island R.R.*,
  985 F.2d 74 (2d Cir. 1993) ...................................................................... 36

*State v. Timblin*,
  657 N.W.2d 89 (Wis. Ct. App. 2002) ...................................................... 32

*United States v. Arias-Izquierdo*,
  449 F.3d 1168 (11th Cir. 2006) ......................................................... 14, 42

*United States v. Marrero*,
  651 F.3d 453 (6th Cir. 2011) ................................................................... 41

*United States v. Wisener*,
  494 F.2d 516 (5th Cir. 1974) ................................................................... 41

*United Tech. Corp. v. Mazer*,
  556 F.3d 1260 (11th Cir. 2009) ............................................................... 47

**Statutes**

28 U.S.C. §1291 ........................................................................................... 3

28 U.S.C. §1332 ........................................................................................... 3

28 U.S.C. §1442 ........................................................................................... 3

**Rules**

Fed. R. Civ. P. 63 ....................................................................................... 34

Fed. R. Evid. 407 ....................................................................................... 46

Fed. R. Evid. 803 ....................................................................................... 47

**Regulation**

40 C.F.R. §211.206-1 ................................................................................... 7

iv

**Other Authorities**

Opening.Br., *Baker v. 3M Co., et al.*,
   No. 21-12517 (11th Cir. filed Feb. 25, 2022) ......................................4

Opening.Br., *Estes v. 3M Co., et al.*,
   No. 21-13135 (11th Cir. filed Feb. 25, 2022) ......................................4

*\*Restatement (Second) of Torts* §533..............................................31, 32

*\*Restatement (Third) of Torts: Liability for Economic Harm* §11 ................. 12, 31

## INTRODUCTION

This appeal follows from one of the sixteen bellwether trials in the multi-district litigation concerning the Combat Arms earplugs version 2 ("CAEv2") that the U.S. military purchased from 3M and Aearo Technologies (together, "Appellants"). As with all those bellwether trials, Appellants were improperly denied their ability to offer a government-contractor defense, the jury was improperly instructed that federal law required direct supplier-to-soldier instructions on earplugs destined for combat use, and the trial was rife with erroneous evidentiary rulings. Despite all that, the jury found for Appellants on all but two of plaintiff Steven Wilkerson's claims: fraudulent misrepresentation and negligent misrepresentation. The jury awarded Wilkerson a total of $8 million in damages on those two claims.

Those misrepresentation claims never should have been presented to the jury, because Wilkerson presented no evidence that he ever received, much less relied on, any false statements from Appellants. Instead, Wilkerson presented evidence about alleged misrepresentations Appellants supposedly made *to the military*—but that never reached *Wilkerson* in any form. The trial featured hours of testimony over technical issues like whether the CAEv2 was "protective up to 190 decibels," whether the CAEv2's advertised Noise Reduction Rating (NRR) of 22 was accurate, and whether the CAEv2 complied with every technical specification in a 2006

contract with the military.  But the evidence makes clear beyond cavil that Wilkerson knew nothing about any of these representations, much less relied on them in utilizing the CAEv2.  When Appellants pointed this out in their post-trial motion, a different judge who did not preside at trial adopted a different theory that bears little resemblance to what the jury heard.  That ruling was procedurally improper and substantively flawed.  Accordingly, the jury's verdict cannot stand, and judgment of law for Appellants must be entered.

If not outright judgment, Appellants are at least entitled to a new trial unblemished by the slew of mistaken and highly prejudicial evidentiary rulings made by the district court.  The most inexplicable and prejudicial of these rulings was the court's decision to exclude two key witnesses for Appellants who, while working for the very competitor that initiated a *qui tam* action against Appellants regarding the CAEv2, had personally tested the CAEv2 and corroborated the NRR that all bellwether plaintiffs (including Wilkerson) have argued was fraudulent.  The court struck the witnesses on the ground that their written test report was hearsay and they had not been designated as experts.  Neither ruling has any basis whatsoever under the Federal Rules of Evidence.  A document's status as hearsay does not preclude *live testimony* from its authors, and witnesses need not be experts to relay results from a test that they *personally* conducted long before litigation ensued.  Because these witnesses were wrongfully prevented from testifying, the jury never learned

that the CAEv2's NRR—an alleged falsehood central to Wilkerson's misrepresentation case—was in fact validated by an independent laboratory test.

The district court also permitted Wilkerson, like all other bellwether plaintiffs, to introduce a host of irrelevant and highly prejudicial documents and testimony. In particular, the district court admitted communications related to the discontinuation of the CAEv2 (an acknowledged subsequent remedial measure) and an investigator's summary of hearsay statements by interviewees in military procurement, which Wilkerson used to argue that Appellants had misled the military about the testing performed on CAEv2. Each of these errors irrevocably tainted the jury's verdict. Together, they undoubtedly require a new trial.

## STATEMENT OF JURISDICTION

The district court had federal subject-matter jurisdiction under 28 U.S.C. §1442(a)(1) and 28 U.S.C. §1332. This Court has appellate jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.    Whether Appellants are entitled to judgment as a matter of law on Wilkerson's misrepresentation claims because Wilkerson failed to present evidence that he received and relied on false statements from Appellants in utilizing the CAEv2, and whether the failure of the presiding judge to resolve Appellants' post-trial motion for judgment complied with Federal Rule of Civil Procedure 63.

3

2.    Whether the district court erred in prohibiting from testifying two witnesses for Appellants who conducted an independent test of the CAEv2 that contradicted a key element of Wilkerson's misrepresentation claims.

3.    Whether the district court erred in admitting communications related to the discontinuation of the CAEv2, which the court itself ruled was a subsequent remedial measure, and in admitting the portion of a civil investigation report summarizing the hearsay statements of interviewees.

## STATEMENT OF THE CASE

### A.  Factual Background

The full history of the CAEv2's development and use by the United States military has been canvassed elsewhere.  *See* Opening.Br.4-13, *Estes v. 3M Co., et al.*, No. 21-13135 (consolidated with *Hacker v. 3M Co, et al.*, No. 21-13133, and *Keefer v. 3M Co., et al.*, No. 21-13131) (11th Cir. filed Feb. 25, 2022); Opening.Br.8-17, *Baker v. 3M Co., et al.*, No. 21-12517 (11th Cir. filed Feb. 25, 2022).  Appellants focus here on the facts underlying the fraudulent and negligent misrepresentation claims on which Wilkerson prevailed at trial:  (1) that 3M falsely claimed that the CAEv2 was "protective up to 190 decibels" in a marketing brochure; (2) that Appellants falsely advertised that the CAEv2 had an NRR of 22; and (3) that Aearo falsely represented that the CAEv2 complied with the "Medical Procurement Item Description" (MPID) that the military created for dual-ended earplugs.

### 1.  The Military Concludes the CAEv2 Is "Protective up to 190 Decibels," and 3M Includes that Conclusion in a Brochure.

**a.**  The assertion that the CAEv2 is "protective up to 190 decibels" originated with the military's interpretation of one of its own studies.  In 1995, as part of the military's research into "nonlinear" hearing protectors (*i.e.*, those allowing soldiers to hear relatively quiet sounds while protecting them against louder noises), Army researchers acquired a unique nonlinear "filter" designed at the French-German Research Institute at Saint-Louis (ISL).  The researchers inserted the ISL filter into an UltraFit earplug (an Aearo product), and tested that prototype on humans, exposing them to loud blasts and removing them from the study when they sustained temporary hearing loss.  S-Gen-55 at 26, 54.

The researchers found that the UltraFit/ISL-filter plug outperformed the nonlinear plugs the Army had designed itself.  After six blasts of 190 decibels, less than ten percent of the subjects had unacceptable temporary hearing loss; furthermore, approximately half of the subjects were able to withstand one hundred 190-decibel blasts.  *Id*. at 135; Trial Tr. at 352:11-15.  After completing the testing, the Army researchers concluded the UltraFit plug using the ISL filter "may be a satisfactory solution."  S-Gen-55 at 145.

In the following years, the military worked with ISL and Aearo to develop the dual-ended CAEv2, which used a modified version of the filter the Army had tested.  After Dr. Doug Ohlin of the U.S. military reviewed and approved the final design

for the CAEv2 in 1999, he submitted a "justification" memorandum asking that the military approve the CAEv2 for bulk purchase. S-Gen-2 at 3. In that memorandum, Ohlin stated that "[t]esting at a U.S. facility found this non-linear earplug *protective up to 190 dbP*," citing the 1995 Army testing. *Id*. at 4-5 (emphasis added).

The military repeated that assertion in an informational publication about the CAEv2 created by Ohlin's office at the United States Army Center for Health Promotion and Preventive Medicine. That information sheet—entitled "Just the Facts"—said that "[t]esting at a U.S. facility found this non-linear earplug *protective up to 190 dbP*," and again cited the 1995 Army testing. S-Gen-70 at 2-3 (emphasis added). The sheet also included some more recent data that ISL had obtained from a 1998 test using a single-ended version of the Combat Arms on manikins. Citing that test, the sheet stated that "[a]t 190 dBP there is an overall peak reduction of 25 dB," meaning that 165 decibels would reach the ear. *Id*.[1]

**b.** 3M later incorporated the military's claim that the CAEv2's non-linear filter was "protective up to 190 dBP" in its marketing materials. As relevant here, one brochure published in 2010 claimed that "[t]he level-dependent technology used in the earplug has been tested and found to be protective up to approximately 190

---

[1] Rather than human subjects, as in the 1995 Army study, manikins (*i.e.*, human body models) are now used for testing at high sound levels. *See, e.g.*, Trial Tr. at 349:21-23.

dBP for outdoor exposures (sufficient to cover most of the weapons in the military inventory, including shoulder-fired rockets)." P-Gen-107 at 2. Like Ohlin and the military, 3M cited the Army's 1995 testing as support for the claim. *Id.*

In 2014, following a customer inquiry, 3M's technical staff revisited the "protective up to 190 dbP" claim first propounded by Ohlin some fifteen years earlier. P-Gen-124. 3M's Elliott Berger and Ted Madison, applying a much more conservative standard than the military had used in the "Just the Facts" sheet, observed that the nonlinear filter "will not reduce 190 dB explosions to a safe level of 140 dB or less." *Id.* at 2. They also noted that "[t]he Army study" used to support the claim "only looked at whether the soldiers experienced temporary [hearing loss] after a few blasts" and "[t]here is more and more evidence that damage to the ears can occur even when [temporary hearing loss] does not occur." *Id.* After further discussion, 3M's technical group concluded in 2016 that the claim that the nonlinear filter was "protective up to 190 dBP," sourced to the 1995 Army study, "should be withdrawn" from the brochure. P-Gen-2475 at 5.

## 2. Appellants Tested the CAEv2 and Found an NRR of 22, which Was Corroborated by an Independent Lab.

Every hearing-protection device sold on the civilian market must be labeled with an NRR, which must be calculated from a real-ear-at-attenuation (REAT) test performed under the "S3.19" standard promulgated by the American National Standards Institute (ANSI). 40 C.F.R. §211.206-1. Aearo conducted its first ANSI

S3.19 test of the CAEv2 in late 1999. Trial Tr. at 616:12-14. The test on the yellow, nonlinear end of the earplug produced an NRR of negative 2, a rating consistent with the expectation that it would attenuate little to no sound at the low levels presented in a REAT test. *Id*. at 759:10-11. But Aearo stopped the test on the green end after completing eight subjects (out of ten) because a few subjects had unusually variable results, which produced an NRR of 11. P-Gen-1 at 2-3. On the next test, the experimenter folded back the opposing flanges before inserting the plug in at least one subject's ears. *Id*. at 2. The results were less variable on this second test, yielding an NRR of 21.7, which Aearo rounded up to 22 on the product's label. *Id*. at 4.

Aside from the foregoing, only one other complete, ten-subject ANSI S3.19 test of the CAEv2 has ever been performed. That test was conducted by an accredited, independent lab operated by Kevin Michael that routinely conducts NRR testing for manufacturers of hearing-protection devices. Michael Dep. at 21:25-22:12, 23:19-21. Michael's laboratory was hired to test the CAEv2 by Moldex, a company with a competing non-linear earplug who had brought a False Claims Act action against 3M. *Id*. at 12:25-13:4; 57:11-14. Moldex had hoped to find that the CAEv2 did not measure up to the advertised NRR of 22, but Michael's lab found the opposite: Michael recorded an NRR of 23 for the green end of the CAEv2, one decibel *higher* than the NRR on the product's label. D-Gen-1523 at 3.

8

### 3. The Military Created a "Medical Procurement Item Description" with Technical Requirements for Competing Earplugs.

In 2006, the Defense Logistics Agency (DLA) created a "Medical Procurement Item Description" (MPID) that was incorporated into an "indefinite-quantity contract" that Aearo bid for in 2006. MDL.Dkt.1071, Ex.55 at 9, 44. The MPID covered "double-ended earplugs" and called for "Aearo Corporation's P/N 370-1000, or equal." P-Gen-13 at 2. The MPID stipulated that "'[e]qual' items shall possess the salient characteristics as specified herein." *Id*. The purpose of these "salient characteristics" was to give *competing manufacturers* the information necessary to "produce substantially the same product," so that companies other than Aearo could bid on the contract if they wished. Trial Tr. at 1632:23-1633:6.

Three "salient characteristics" from the MPID are relevant to Wilkerson's misrepresentation theories. First, the MPID required that "[t]he sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19." P-Gen-13 at 3. Wilkerson argued Aearo violated ANSI S3.19 by stopping the first test and starting a new one (although Wilkerson never identified any applicable provision of the protocol that was violated by the stop and re-start).

Second, the MPID required that "the yellow end of the earplug shall incorporate a passive non-linear technology that has been empirically shown to provide a level-dependent increase in sound attenuation" and "provide[s] this protection at sound-pressure levels up to 190 dBP(peak), even after the user has been

9

exposed to 100 free-field noise impulses of 190 dBP(peak), minimum." *Id*. at 3. This requirement traced back to Ohlin's original "protective up to 190 decibels" claim: The DLA asked for Ohlin's input when it prepared the MPID in 2006, and Ohlin suggested a "performance based characteristic," based on his interpretation of the 1995 Army testing, "to keep out inferior products." D-Gen-278 at 2.

Third, the MPID required that manufacturers conduct "sampling" for each characteristic. In particular, the "sound attenuation of the level-dependent yellow end" had to be verified for "100 percent" of earplugs "using an acoustical impedance test." P-Gen-13 at 4. Aearo's manufacturing facility in Mexico used an "acoustic resistance checker," or "ARC box," to test the yellow end of each earplug and ensure that the nonlinear filter was working appropriately (specifically, that neither too much nor too little sound was flowing through the small holes in the non-linear filter). Trial Tr. at 653:6-10. When it first started using them, however, the Mexican facility had trouble properly calibrating the ARC boxes, leading Aearo to issue a series of waivers adjusting the permissible range of readings on the ARC box testing. *See* Trial Tr. at 1672:4-14. One waiver indicated that 80% of all CAEv2 were failing the test. *Id*. at 95:17-96:4. Aearo eventually discovered that the calibration issue stemmed from the altitude difference between the Mexican facility and Aearo's laboratory in Indianapolis (where the ARC boxes were originally calibrated). *See* Trial Tr. at 919:4-6; Kieper Dep. at 665:14-666:14. The MPID contemplated that

the competing manufacturer would conduct sampling "for inspection of the sound attenuation of the camouflage green end." P-Gen-13 at 4. Aearo's manufacturing facility did not test the green end of the CAEv2 (which is a simple solid earplug) using the ARC box, and relied instead on visual inspection. Trial Tr. at 1675:23-1676:4.

## B. Procedural Background

Wilkerson's case was the fifteenth bellwether case to be tried in this multi-district litigation. By the time the case reached trial, the district court had made several erroneous rulings in other bellwether cases, all of which applied with equal force in Wilkerson's trial. Those rulings deprived Appellants of their principal defense to liability and caused the jury to be told that Appellants had an obligation to provide instructions directly to soldiers like Wilkerson. Together, those two erroneous rulings gave the jury a wholly distorted view of the government's role and Appellants' responsibilities vis-à-vis soldiers using the earplug in the military. In addition, three rulings are particularly relevant to the issues presented in this appeal.

### 1. The District Court Permits Unsubstantiated Misrepresentation Claims to Proceed to Trial.

In the very first bellwether case to proceed to motion practice, Appellants moved for summary judgment on the plaintiff's claims because he could not "point to any evidence that he relied in any way on a false statement or representation by any of the Defendants in his decision to wear the CAEv2." *Estes*.Dkt.26 at 27. The

11

district court not only denied the motion; it made clear that, in its view, misrepresentations made "to … the military" were independently actionable, even if the plaintiff did not receive them, much less rely on them. *Estes*.Dkt.53 at 19. As the court further explained when it denied Appellants' Rule 50(a) motion in the first bellwether trial, a plaintiff could allege that "Defendants' affirmative misrepresentations induced the military to purchase the CAEv2 for use by soldiers, and that Plaintiffs reasonably and foreseeably relied on the military's purchase of the CAEv2 in choosing to use the CAEv2 during their military service." *Estes*.Dkt.175 at 5. In other words, a plaintiff could allege that, even though he did not personally rely on an alleged misstatement by the Appellants, he *relied on the military's reliance* on that misstatement.

In the next round of bellwether cases, Appellants again moved for summary judgment on the plaintiffs' misrepresentation claims, presenting the district court with ample authority rejecting its theory of indirect reliance. *See Adkins*.Dkt.32 at 5-6; *e.g.*, *Restatement (Third) of Torts: Liability for Economic Harm* §11 cmt. b (explaining that plaintiffs "must show that they themselves relied on what the defendant said, not that they were injured by the reliance of others"). The district court denied the motions but, shifting its position, appeared to recognize that the plaintiff had to prove that "[d]efendants affirmatively misrepresented information regarding the CAEv2 to the military *and that the military repeated those*

*misrepresentations or communicated their substance to [the plaintiff]*," not just that the plaintiff relied on the military's reliance. *Adkins*.Dkt.58 at 5 (emphasis added).

Accordingly, Appellants moved in limine in the next relevant case (*Adkins*) to exclude all evidence relating to the "190 dB" issue and "alleged MPID violations" because Adkins, like Wilkerson and all other bellwether plaintiffs, "d[id] not allege he ever received or relied on any statements regarding the CAEv2's ability to protect users at 190 decibels [or] its compliance with the MPID." *Adkins*.Dkt.49 at 4. The district court denied the motion in a single sentence: "Evidence that Defendants misrepresented the CAEv2's capabilities and characteristics is relevant to numerous claims and defenses, including Adkins' fraud and misrepresentation claims." *Adkins*.Dkt.62 at 2. The court did not address Appellants' argument that any misrepresentation claims based on the 190-decibel and MPID-compliance issues would fail for lack of reliance, and it did not explain how those issues could be relevant to other claims.

### 2. The District Court Prohibits Appellants' Witnesses From Discussing the Favorable Results From the Michael Laboratory Test.

In the first two bellwether trials, the district court excluded the Michael laboratory test as hearsay, but allowed, to a certain extent, (i) Appellants' expert witnesses to discuss the test and its NRR of 23 in explaining their opinions, and (ii) Appellants to use the test when cross-examining plaintiffs' testing experts. *See,*

*e.g.*, *EHK* 4/27/21 Tr. at 130:13-134:2. When the Michael test was discussed, the court explicitly prohibited the jury from "consider[ing] the study for the truth of the study results"; instead, the jury could only "consider [the expert's] reliance on [the test] when you evaluate his opinion." *Id*. at 131:10-12.

Before the third bellwether trial (*Baker*), Appellants included Kevin Michael on their witness list so that he could establish that the test report satisfied the business-record exception to the hearsay rule and testify directly to his knowledge of the test results, thereby allowing the results to be considered for their truth. But plaintiff moved in limine to strike Michael from the witness list, and the district court granted the motion. *Baker*.Dkt.118.

The court explained that, because the test reports had been prepared for litigation purposes (specifically, Moldex's own suit against Appellants), it was unclear they could satisfy the business-record exception. *Id*. at 2 (citing *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1183-84 (11th Cir. 2006)). Although Michael had testified in the earlier litigation that "he did not know what [Moldex] planned to do with the Test Reports," the court said there was no evidence that the employee who actually conducted the test, Eileen Kline, "was similarly unaware" of the reason for the testing. *Id*. And because Kline had not been designated as a witness, there was "no witness with personal knowledge of the Lab's testing of the

CAEv2 or of the Test Reports' validity as would be required to lay the necessary foundation for their admission." *Id*. at 3.

Appellants responded to the district court's order by adding Eileen Kline to their witness list for the next bellwether trial (*Adkins*). Plaintiffs then moved to strike Michael *and* Kline, and the district court granted the motion. *Adkins*.Dkt.91 at 5. The court first found, without explanation, that "the Test Reports are hearsay not within a recognized exception." *Id*. But even if the test reports "were not inadmissible hearsay," the court said it would exclude them "under Rules 702 and 403 because they require expert testimony given that ANSI S3.19-1974 was the basis for the test." *Id*. The court then proceeded to bar Michael and Kline from testifying. In the absence of the excluded test reports, the court thought, "their testimony would simply constitute back door hearsay." *Id*. Michael and Kline had also not been designated as expert witnesses, and the district court "ha[d] permitted only expert witnesses to discuss the technical aspects of ANSI S3.19-1974 testing in prior trials." *Id*.

In both of its orders preventing Michael and Kline from testifying, the district court stated that its rulings did "not preclude either side from questioning an expert witness about his consideration of the Test Reports in forming his expert opinions." *Id*. at 5-6; *Baker*.Dkt.118 at 3. But that changed after just two more bellwether trials, when the district court concluded Appellants had been attempting to use the test "for

the truth of its contents." MDL.Dkt.2244 at 2. The court "*sua sponte* reconsider[ed] its ruling" on the issue and ordered that the testing "may not be used for any purpose with any witness in any future bellwether trials in this MDL." *Id*. Thus, the last eleven bellwether trials, including Wilkerson's, lacked *any* reference to the fact that an independent, respected laboratory retained by 3M's competitor had validated the 22 NRR recorded in Aearo's own testing and listed on the CAEv2, but alleged by plaintiffs (including Wilkerson) to be false.

### 3. Wilkerson's Trial

On August 24, 2021, two months after the conclusion of the third bellwether trial, the district court "deem[ed] it necessary to accelerate the bellwether trials" in light of "the unprecedented backlog of cases piling up on the administrative docket" the court had created. MDL.Dkt.1881 at 1. The district court "reached out to other judges in the Northern District of Florida to try cases" at a breakneck pace. *Id*. at 2. Ultimately, fourteen bellwether cases, including Wilkerson's case, were tried in a nine-month period between September 2021 and May 2022. Chief Judge Mark Walker presided over Wilkerson's trial from March 14 to March 25, 2022. The parties stipulated that Wisconsin law would govern Wilkerson's case, Dkt.48, and Chief Judge Walker told the parties that to "preserve[]" issues "for appeal," they "need not have to renew" objections to prior rulings made by Judge Rodgers, whether "on summary judgment" or "evidentiary issues." Trial Tr. at 8:18-19; *see*

*also id.* at 38:20-25 (counsel "do not have to object to those prior rulings in order to preserve them for the record").

### a. Wilkerson Pursues Misrepresentation Theories Based on Statements He Never Received or Relied on.

At trial, Wilkerson never claimed that he received the brochure stating that the CAEv2's nonlinear filter was "protective up to 190 dbP," never claimed he reviewed the "salient characteristics" described in the MPID, and never claimed he had ever taken note of the CAEv2's NRR—much less relied on any of these representations. Indeed, Wilkerson candidly admitted that he "do[es]n't know what an NRR rating is." Trial Tr. at 1330:4-5. But Wilkerson nonetheless pursued misrepresentation theories based on these alleged statements—and the jury found Appellants liable for misrepresentation, the only claims on which Wilkerson prevailed.

*The NRR of 22*. Beginning in the opening argument, Wilkerson's counsel asserted that the NRR of 22 was false, and that the NRR of 11 from the incomplete first test reflected the true performance of the CAEv2. On that theory, Aearo was only able to obtain a 22 NRR result because it "stack[ed] the deck" by using "employees" and "family members of employees" as test subjects who they "kn[e]w get good NRRs." Trial Tr. at 85:19-21. The difference between a 22 NRR and 11 NRR was critical, Wilkerson's counsel argued, because "if you have a product that you think is going to filter out something like 22 decibels and, in fact, it's got an 11

NRR," you only receive "12.5 percent" of the protection you expected. *Id*. at 84:6-8.

Wilkerson's first witness, Richard McKinley, supported the allegation that the 22 NRR was fraudulent by testifying that it was illegitimate for Aearo to disregard the first, eight-subject test with its NRR of 11, *id*. at 287:13-21, and that the second test was "not a valid test" because there "was not a consistent configuration of the earplug." *Id*. at 361:24-362:1. Another one of Wilkerson's experts, Dr. Hamid Djalilian, testified that it was "not proper" to stop the first test, *id*. at 758:12, and that the CAEv2 "[n]ever ha[d] an accurate NRR on its label." *Id*. at 777:16-18. Dr. Mark Packer, a plaintiff's expert who had worked at the military's "Hearing Center of Excellence," *id*. at 1382:4-13, testified that the military relied on the NRR of 22 and that an NRR of 11 for the green end would have been "insufficient." *Id*. at 1409:15-1410:6. Wilkerson's counsel came back to the issue multiple times in closing argument, asserting that "[t]he NRR was wrong," *id*. at 2842:25, and that the earplug's packaging "did not contain the correct NRR." *Id*. at 2846:13-14. By contrast, Appellants were unable even to mention the critical fact that Michael's independent lab had recorded an NRR of 23 on the CAEv2.

*The 190-decibel claims.* Wilkerson's first witness, McKinley, devoted a significant portion of his day-and-a-half of testimony to the 190-decibel issue. *Id*. at 363:23-381:25. He told the jury the CAEv2 "were advertised as protecting from

190 [decibels], and … the MPID, the item description where they were purchased, said 100 impulses, 100 shots at 190 dB," and read both documents into the record. *Id.* at 353:10-12; *see id.* at 357:23-360:9. McKinley observed that, in the Army's 1995 testing on the ISL filter, at "190 dB, at 100 shots, that you have 50 percent … of the subjects having unacceptable temporary threshold shift[s]." *Id.* at 368:25-369:2. According to McKinley, those data showed "the nonlinear filter was not protective enough at 190 dB and 100 shots." *Id.* at 369:13-14. McKinley went on to review internal 3M emails regarding the use of the CAEv2 on gun ranges and asserted they were "grossly inconsistent" with the 190-decibel claim. *Id.* at 381:23-25; *see id.* at 373:7-381:25.

Two of Wilkerson's other expert witnesses, Dr. Christopher Spankovich and Dr. Mark Packer, reprised McKinley's testimony that the claim "that the Combat Arms version 2 is protective up to approximately 190 decibels" in 3M's marketing materials was not true. *Id.* at 1116:3-17; *see id.* at 1426:8-1433:25. Wilkerson's counsel also cross-examined a former military and current 3M audiologist about the 190-decibel claim, showing him an email stating he believed the claim "should be withdrawn." *Id.* at 2006:19. That witness explained he was "uncomfortable with any single hearing protector being used at that level," *id.* at 2003:7-8, and that "Army policy" required dual protection in the form of earmuffs worn over earplugs "at anything above 165 decibels." *Id.* at 2013:3-4.

*MPID compliance*.  Wilkerson's counsel also introduced the MPID to the jury in his opening statement, claiming that Appellants had violated its requirements that the CAEv2 "be tested according to ANSI S3.19" and that Appellants "quality control test every plug." *Id.* at 95:13-15.  Wilkerson's counsel discussed the quality-control testing at the Mexican facility at length, and even showed the jury the waiver indicating that 80% of CAEv2 had failed the test. *Id*. at 95:17-96:22.

Wilkerson offered McKinley as an expert on "the MPID," and McKinley discussed the document in detail. *Id*. at 218:16.  McKinley began by reading a 2006 email between Aearo's Brian Myers and the official at the DLA who was preparing the MPID. *Id*. at 338:5-340:5; P-Gen-94.  Myers told the DLA official that ANSI S3.19 testing was "required to establish the Noise Reduction Rating (NRR)" of the CAEv2 and that "[t]he testing was conducted … only once in our EARCal labs." *Id*. at 339:15-18.  After McKinley read that statement to the jury, he immediately asserted it was false because it omitted any mention of the first test that was stopped after eight subjects. *See id*. at 339:21-23 (Q: "Was it conducted only once?"  A: "No. When you run eight subjects, you know, that is a test[.]").

McKinley also argued Appellants had violated other MPID requirements.  He claimed Appellants flouted the quality-control requirement by issuing waivers when earplugs failed the ARC box testing in Mexico, and by not testing the attenuation of the green end of the earplug. *Id*. at 382:1-386:7.  And he asserted Appellants failed

to perform the required ANSI S3.19 test because "throwing away eight subjects' data doesn't comply with th[e] standard." *Id*. at 287:13-21.

Another one of Wilkerson's expert witnesses, Admiral Althea Leslie, devoted her entire two-and-a-half-hour testimony to Appellants' alleged violations of the MPID. A purported "government procurement" expert, Leslie gave the opinion that "3M failed to meet the standard of care required of government contractors when it sold the CAEv2 [and] that [it] did not conform to the requirements in the Medical Procurement Item Description." *Id*. at 1627:2-5. Although Leslie candidly disclaimed any technical expertise, *id*. at 1690:9-16, she nonetheless testified that the CAEv2 did not satisfy the MPID's requirement for protection at 190 decibels, *id*. at 1639:3-1642:18, that Aearo's REAT testing of the CAEv2 did not comply with ANSI S3.19, *id*. at 1644:9-1659:19, and that Appellants failed to properly conduct the required quality-control testing. *Id*. at 1668:1-1677:12. Leslie also repeated McKinley's claim that Myers had misled the DLA when he stated the CAEv2 had been tested "only once" in Aearo's lab. *Id*. at 1648:23-1651:3.

*Wilkerson's testimony*. In stark contrast to the parade of witnesses testifying at length to the alleged falsity of Appellants' representations, Wilkerson himself had nothing to say about 3M's brochures, the MPID, or the NRR of 22 in his testimony—because he knew nothing about them. Wilkerson could not recall receiving "any written materials" about the earplugs and agreed that "nothing that [he] saw in an

information or an advertisement was the reason [he] used the Combat Arms." *Id.* at 1329:17-1330:2. Wilkerson explained that he used the CAEv2 "because it was issued." *Id.* at 1330:2.

Wilkerson did claim he heard a presentation from a "civilian [who] came in and passed the earplugs out to all of the soldiers and went through a short PowerPoint presentation." *Id*. at 1250:16-18. This "civilian presenter" told the soldiers, according to Wilkerson, that "the yellow end is for, say, patrols when you're not expecting any kind of gunfire, and the green end is for when you go to the rifle range because it blocks out everything." *Id*. at 1250:18-21. Wilkerson acknowledged that he did not have "any idea who the civilian was and who they worked for." *Id*. at 1252:24-1253:1.

In closing argument, Wilkerson's counsel made no reference to this claimed civilian presentation. Instead, he expressly tied the negligent and fraudulent misrepresentation claims to the alleged violations of the MPID, despite Wilkerson's total silence on the matter. Wilkerson's counsel read the jury their charge on the misrepresentation claims—"Do you find … that 3M fraudulently misrepresented information on which Mr. Wilkerson justifiably relied, and that misrepresentation was a producing cause of Mr. Wilkerson's injuries?"—and said, "The answer to that question is yes. If you will remember [A]dmiral Leslie's testimony, this company actually entered into an agreement with the military called the MPID." *Id*. at

2846:17-25. He then read the 190-decibel provision and claimed "[t]hat's what this company said this plug would do to the United States military. Now y'all know … that's not right." *Id*. at 2847:16-24. Wilkerson's counsel referenced the other alleged MPID violations as well: "[T]here's representations in the next paragraph about that they complied with ANSI 3.19, which they didn't, and there's representations that go on to say that they are going to sample and test the quality, which they didn't. You'll remember the Mexico story and the 80 percent defect." *Id*. at 2848:8-12. And he also reminded the jury of the allegedly false statements Appellants had made in "ads and brochures." *Id*. at 2848:16. According to Wilkerson's counsel, it made no difference whether Wilkerson actually read any of the claims in the MPID or 3M's brochures because "representations made to the Army [are] the same as making the representations to Steven, Mr. Wilkerson." *Id*. at 2850:6-7.

### b. Wilkerson Capitalizes On Inadmissible Evidence.

Wilkerson also repeatedly seized upon erroneous evidentiary rulings by the district court that put inadmissible documents and testimony before the jury.

**1.** Wilkerson tried to suggest that Appellants themselves had determined the NRR of 22 was false by introducing a 2015 email in which the business director of 3M's hearing protection division, Brian Myers, told subordinates to cancel all orders of the CAEv2, and, in response to questions, explained that the company "cannot ship any further products with current labeling" and "cannot distribute this with the

current NRR on the package." P-Gen-128 at 1, 3. The district court had already held that all "evidence of 3M's discontinuation of sales of the CAEv2 is a subsequent remedial measure" and thus was "plainly inadmissible to prove Defendants' negligence, culpable conduct, that the CAEv2 was defective, or the need for warning or instruction." MDL.Dkt.1693 at 12–13. On that basis, Appellants objected to the business director's email before the second bellwether trial. The court sustained the objection in part, but carved out the statements regarding the labeling and NRR, ruling they were admissible because the statements were "not intertwined with discontinuation, nor do they lead to the conclusion that the product was discontinued." *McCombs*.Dkt.105-1 at 7.

In his trial, Wilkerson used those plainly inadmissible statements to argue that the NRR of 22 for the CAEv2 was false. Dr. Djalilian testified that "there was an email that went out that basically they [cannot] be distributing it with the NRR that's on the label." Trial Tr. at 775:7-9. Djalilian read the statements from the email to the jury and then, when asked whether "the Combat Arms version 2 ever ha[d] an accurate NRR on its label," answered "[n]o." *Id.* at 777:16-18. Wilkerson's counsel also cross-examined the email's author, Brian Myers, about the inadmissible and prejudicial statements. Wilkerson's counsel began by asking Myers whether he was "proud that 3M sold a product with an incorrect NRR to the military." *Id.* at 2207:9-10. Counsel then had Myers read the statements from his email and asked Myers

24

whether he himself "believed in 2015 … that the NRR listed on the Combat Arms Version 2 was, in fact, inaccurate." *Id*. at 2212:13-15.

**2.** Wilkerson also relied extensively on the summary of an investigative report from the *qui tam* litigation instigated by a 3M competitor. The Department of Justice report summarized interviews with military officials about whether they knew about Appellants' test results and whether that information was material to their purchase decision. *See* P-Gen-10. The vast majority of the interviewees were procurement officials with no expertise in hearing protection. *Id*. at 7-8.

The summary of the investigation stated: "Interviews of US government personnel confirmed that had they known about the February 2000 test results (i.e., that the CAE was too short for proper insertion in the users' ears and, therefore, did not perform well in certain individuals) on the CAE they may not have purchased the items." *Id*. at 7. Appellants moved to exclude the report and underlying interview notes as hearsay. MDL.Dkt.1664 at 6-7. The court excluded the interview notes, but ruled the summary of the notes constituted a "factual finding" from a government investigation, and thus qualified for the public-records exception in Rule 803(8). MDL.Dkt.1693 at 5-6.

At trial, Wilkerson repeatedly used the *qui tam* report to argue that Appellants had withheld information about their testing of the CAEv2 from the military. Wilkerson's counsel read the summary of the report during both opening statement

and closing argument and claimed it showed there was a "pattern and practice" of "not shar[ing]" information with the military. Trial Tr. at 96:12-97:19, 2851:5-25, 2898:9-10. Wilkerson also used the report with three different expert witnesses, *id*. at 405:19-407:11, 674:9-17, 708:19-709:4, 1451:5-1452:13, including the "procurement expert" Admiral Leslie, who testified that if "3M [had] disclosed information that [was] in their files … the government may not have purchased the Combat Arms Earplug back in 2000." *Id*. at 1677:21-1680:15.

### 4. A Non-Presiding District Court Judge Denies Defendants' Motion for Judgment as a Matter of Law.

At the close of Wilkerson's case, Appellants moved for judgment as a matter of law on the misrepresentation claims because Wilkerson "failed to offer any evidence that Defendants made a false statement or representation to him, let alone one … which he relied on." Dkt.182 at 9. After the jury rejected all of Wilkerson's claims (including design-defect and failure-to-warn) except his misrepresentation claims, Appellants renewed the argument in a post-trial motion. Dkt.213 at 2-6. Although Chief Judge Walker presided over the trial, and without any prior notice to the parties, Judge Rodgers decided the motion, noting in a footnote that she had "observed the entire trial over Zoom." Dkt. 220 at 1 n.1. Neither Judge Rodgers nor Chief Judge Walker indicated that Chief Judge Walker was unavailable to rule on the post-trial motion as required by Federal Rule of Civil Procedure 63.

26

Judge Rodgers rejected Appellants' argument, not because of any evidence that Wilkerson had received or relied on representations like "protective up to approximately 190 decibels," the NRR of 22, or the MPID, but on the basis that Wilkerson had "testif[ied] that a civilian instructor represented that the CAEv2's yellow end would be protective on patrols and the green end would be protective on the gun range" and Wilkerson had "used the CAEv2's yellow end while on patrol and the green end on the gun range." *Id*. at 4, 8. Judge Rodgers cited no evidence of record as to who this person was, for whom he or she worked, or anything else that would indicate he or she had any relationship whatsoever to Appellants.

## SUMMARY OF ARGUMENT

**I.** Wilkerson's misrepresentation claims fail because he never even received, much less relied on, the alleged misstatements that he targeted at trial. It is *undisputed* that Wilkerson knew nothing about the 190-decibel claim, the NRR of 22, or the MPID. The military received (and, indeed, originated) some or all of those claims, but to prevail on fraudulent and negligent misrepresentation claims, Wilkerson must show that he himself received and relied on an alleged misrepresentation. That is black-letter law in Wisconsin as elsewhere. Wilkerson's jury argument—that it makes no difference whether Wilkerson received and relied on the misrepresentations, because a misrepresentation made to the military is effectively a misrepresentation to Wilkerson—is plainly wrong as a matter of law.

27

Nor can Wilkerson salvage his misrepresentation claim, as Judge Rodgers did, by identifying alleged misstatements made by an unidentified civilian who gave him his CAEv2 and told him which end of the dual-sided plug to use when. That ruling was procedurally infirm under Rule 63, and substantively flawed in all events. Wilkerson made clear that he used the CAEv2 because that is what the Army gave him—not in reliance on anything the civilian or anyone else represented about the earplug.

**II.**    At a minimum, Appellants are entitled to a new trial on Wilkerson's misrepresentation claims because the district court improperly struck two witnesses, Michael and Kline, who would have testified that they obtained an NRR of 23 when they independently tested the CAEv2. That testimony would have provided critical support for the truth of the 22 NRR that Wilkerson consistently argued was fraudulent. The district court barred Michael and Kline from testifying because it believed their testimony would be "back door hearsay" of their written test report, and that only expert witnesses could discuss ANSI S3.19 testing. The court was simply confused to think that testimony about a test the witness *personally conducted and observed* could ever be hearsay, regardless of whether the written report of the test is admissible, and also ignored the fact that Kline could have provided the foundation to admit the report as a business record. And because Michael and Kline were going to provide fact testimony about their actual testing

conducted independent of this litigation—not opinions—no expert designation was necessary.

**III.**    Numerous evidentiary errors also require a new trial.    The court admitted an email relating to the discontinuation of the CAEv2, which plainly should have been excluded as a subsequent remedial measure, and which Wilkerson used to argue Appellants themselves had determined the NRR of 22 was false.    On top of that, the district court admitted the hearsay statement from the *qui tam* investigation that "[i]nterviews of US government personnel confirmed that had they known about the February 2000 test results … they may not have purchased the items," even while acknowledging that the underlying interviews were inadmissible hearsay.    The individual and collective impact of those evidentiary errors deprived Appellants of a fair trial and require vacatur of the jury verdict.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment as a matter of law "de novo" and "appl[ies] the same standard as the district court."  *Nebula Glass Int'l v. Reichhold, Inc.*, 454 F.3d 1203, 1210 (11th Cir. 2006).  The court should affirm the denial of the motion only if the plaintiff "present[s] evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim."  *Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 659 (11th Cir. 1998).

"Rulings on the admissibility of evidence are reviewed for abuse of discretion," but "[a] district court by definition abuses its discretion when it makes an error of law." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 556 (11th Cir. 1998).

## ARGUMENT

### I. Wilkerson's Misrepresentation Claims Fail As A Matter Of Law Due To Insufficient Evidence That He Received Or Relied on False Statements From The Appellants.

Wilkerson never received, much less relied on, any of the alleged misstatements regarding protection at 190 decibels, the NRR of 22, or the MPID's technical specifications. Indeed, Wilkerson could not recall receiving "any written materials" about the earplugs and agreed that "nothing that [he] saw in an information or an advertisement was the reason [he] used the Combat Arms." Trial Tr. at 1329:17-1330:2. Wilkerson used the CAEv2 for one simple reason: "I used it because it was issued." *Id.* at 1330:2. The complete lack of evidence that Wilkerson utilized the CAEv2 because of any advertising, written materials, or other statements or representations that Appellants made to him defeats his misrepresentation claims as a matter of law, requiring judgment for Appellants.

Wilkerson has never disputed that he did not receive or rely on statements about the CAEv2. Instead, Wilkerson has always argued that such evidence was unnecessary because he could simply point to the fact that the *military* received the

alleged misrepresentations. Thus, Wilkerson put on hours of testimony about purported misstatements that Appellants made to the military, not to soldiers like Wilkerson. *See* pp.17-23, *supra*. And in closing argument, Wilkerson's counsel expressly tied Wilkerson's misrepresentation claims to the statements in the MPID and 3M's advertising on the theory that "representations made to the Army [are] the same as making the representations to Steven, Mr. Wilkerson." Trial Tr. at 2850:6-7.

That theory is simply contrary to black-letter law in Wisconsin. The tort of misrepresentation requires the *plaintiff* to receive and rely on a false statement made by the *defendant*. The Restatement is clear and unambiguous: "Directly or indirectly … plaintiffs who sue for fraud must show that *they themselves* relied on what the defendant said." *Restatement (Third) of Torts* §11 cmt. b (emphasis added). Plaintiffs may not allege "that they were injured by the reliance of others." *Id*.; *see also id.* cmt. a (claim fails "if the plaintiff suffered harm as a result of the defendant's fraud but without relying on it"); *Restatement (Second) of Torts* §533 (defendant's misrepresentation to third party actionable if plaintiff is "person relying upon" misrepresentation). Here, that means Wilkerson's misrepresentation claims cannot rest on the theory that the military relied on misstatements by Appellants when it chose to obtain and distribute the CAEv2 to soldiers like Wilkerson and that, in turn, Wilkerson was "injured by the reliance of" the military.

31

Wisconsin law fully embraces this bedrock principle. *See, e.g.*, *Lundin v. Shimanksi*, 368 N.W.2d 676, 680-81 (Wis. 1985) (plaintiff alleging intentional misrepresentation "must rely on it and thereby be induced to act, to his own injury or damage"); *Ramsden v. Farm Credit Servs. of N. Cent. Wis. ACA*, 590 N.W.2d 1, 8 (Wis. Ct. App. 1998) (negligent misrepresentation claim requires misstatement that "plaintiff believed to be true and relied on to his/her detriment").  A plaintiff can receive the defendant's misstatement *through* a third party, but he still must receive it and rely on it; the misstatement must "be repeated to" and "acted upon by" the plaintiff.  *State v. Timblin*, 657 N.W.2d 89, 97 (Wis. Ct. App. 2002) (citing *Restatement (Second) of Torts* §533).  Thus, for example, a recent decision applying Wisconsin law concluded that a plaintiff's misrepresentation claim failed precisely because two alleged misrepresentations made by the defendant to a third party had never been communicated to, much less relied on by, the plaintiff.  *See In re Syngenta AG Mir 162 Corn Litig.*, 2019 WL 4013962, at *5 (D. Kan. Aug. 26, 2019).  That reasoning applies *a fortiori* in this case.  Even assuming the *military* received and relied upon misstatements by Appellants, there is no evidence that *Wilkerson* ever received and relied upon those misstatements.  Because this Court has long recognized that "'substantive innovation' in state law is something that ought to be left to state courts," *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1335 (11th

Cir. 2021), it should decline plaintiff's invitation to expand Wisconsin tort law to include reliance-on-reliance theories of misrepresentation.

Moreover, even if Wilkerson's theory were viable (and it is not), there is no evidence that even the *military* relied upon the alleged misstatements that it purportedly received. The military itself is the source of the 190-decibels claim, so it could not have relied on Appellants' repeating that information in a 2010 brochure, issued when the military already had a decade's worth of experience with the earplug. The MPID's "salient characteristics" apply only to "equal items," not the CAEv2—as the MDL plaintiffs themselves argued in the district court, *see* MDL.Dkt.1072-1 at 20—because the MPID's purpose was to give performance targets to competitors who bid on the contract, so that any other dual-ended earplug the military might purchase would be at least as good as the CAEv2, with which the military had years of positive experience. And there is no evidence that the military procured the CAEv2 because of its stated NRR of 22. Indeed, the military approved the CAEv2 for bulk purchase before the NRR was even calculated. *See* S-Gen-2.

In her post-trial decision denying judgment as a matter of law, Judge Rodgers did not even address, much less justify, Wilkerson's theory at trial. That was almost certainly the result of a threshold error in the decision: although Chief Judge Walker had presided over Wilkerson's trial, Judge Rodgers decided Appellants' post-trial motions without notice, explanation, or any attempt to satisfy the federal rules.

33

Federal Rule of Civil Procedure 63 permits a judge who did not preside over a trial to decide post-trial motions, but only where the trial judge "is unable to proceed" and the successor judge "certif[ies] familiarity with the record."  Fed. R. Civ. P. 63. Here, there is no indication whatsoever that Chief Judge Walker was "unable to proceed" with deciding Appellants' post-trial motions.  In fact, not only did Judge Rodgers provide no reason for re-inserting herself into the case; she gave no notice whatsoever that she would be deciding the motions.  Nor did she properly "certify[] familiarity with the record."  Judge Rodgers did indicate that she "observed th[is] entire trial over Zoom."  Dkt.220 at 1 n.1.  But observing the proceedings via Zoom is no substitute for participating in person, let alone presiding in person as Chief Judge Walker did.

The failure to comply with Rule 63 is particularly unfortunate for two reasons. First, the misrepresentation theory that Judge Rodgers identified as having support in the evidentiary record—that Wilkerson relied on representations by a "civilian presenter" to Wilkerson—bore no resemblance to the misrepresentation theory that was advanced in Chief Judge Walker's courtroom—that Wilkerson relied on representations by Appellants to the military.  The content, source, and recipient of the alleged misrepresentation were all different.  Second, and equally troubling, Judge Rodgers's reassertion of control at the post-trial stage further diminished any value the trial might have had as a bellwether result that could inform the value of

other cases. Although still governed by the MDL Court's pre-trial rulings, which deprived Appellants of their principal defense and allowed plaintiffs to label Appellants lawbreakers, Wilkerson's trial still gave the parties an opportunity to see how the claims fared before a different judge. By reasserting control over the post-trial proceedings in the absence of any indication that Chief Judge Walker was "unable to proceed," Judge Rodgers undermined the value of this case as a bellwether.[2]

In all events, Judge Rodgers's decision was flawed on the merits. She upheld Wilkerson's misrepresentation verdict based on a theory Wilkerson never submitted to the jury: that a "civilian" who "passed the earplugs out to all of the soldiers" told them "the yellow end is for, say, patrols when you're not expecting any kind of gunfire, and the green end is for when you go to the rifle range because it blocks out everything." Trial Tr. at 1250:18-21. For multiple reasons, this statement cannot support a misrepresentation claim (which readily explains why Wilkerson never argued it to the jury).

---

[2] Judge Rodgers's *sua sponte* determination of the post-trial motions is far from the only such peculiarity distorting the value of this case as a bellwether. For example, despite the fact that Chief Judge Walker tried Wilkerson's case, Judge Rodgers nevertheless sent real-time messages to Chief Judge Walker during the trial that clearly informed Chief Judge Walker's decisionmaking. *See, e.g.* Trial Tr. at 2172:24-2173:1 (Chief Judge Walker rejecting request by Appellants' counsel, stating "that's not going to fly because I've been getting realtime messages from my colleague who is listening in").

*First*, there is no basis to concluded that the civilian was associated with Appellants.  Wilkerson himself conceded that he did not have "any idea who the civilian was" or "who they worked for."  *Id.* at 1252:24-1253:1.  Nor did Judge Rodgers identify any record evidence supporting a claim that the individual worked for Aearo or 3M.  Given that there is no liability for a representation that cannot be traced back to a defendant, *see Hennig v. Ahearn*, 601 N.W.2d 14, 22 (Wis. Ct. App. 1999) (noting that "to prevail on any misrepresentation claim, [plaintiff] must establish … that [defendant] made a representation of fact that was untrue"), the idea that Appellants could be held liable for a statement that the plaintiff could not even attribute to Appellants and did not feature in his argument to the jury is untenable, *see Boggan v. Data Sys. Network Corp.*, 969 F.2d 149, 152 (5th Cir. 1992) ("Because theories not before the jury ... may not provide the basis for upholding the jury verdict, the verdict can only be sustained on appeal based on the fraud theory submitted to the jury[.]"); *Sinclair v. Long Island R.R.*, 985 F.2d 74, 77-78 (2d Cir. 1993) (explaining that "the district court, in its post-trial decision, suggested that [plaintiff's] jury verdict could be sustained on a 'failure to inspect' theory … [but] the verdict for [plaintiff] cannot be sustained on a theory that was never presented to the jury").

*Second*, the statement from the unidentified civilian, even if it could be attributed to Appellants, is not false.  The civilian simply told the soldiers what the

two ends of the CAEv2 were "for," and on that, he was exactly right. The yellow end was to be used when situational awareness was important, as on patrol, and the green end was to be used when significant noise exposure was certain and there was no need to hear commands or other environmental noises, as on the gun range. The statement that the green end "blocks out everything" could not reasonably have been meant or understood literally. The user will obviously still hear *something* with the green end of the CAEv2 (or any other earplug, for that matter). Rather, the point is that the green end provides *more* attenuation than the yellow end at all sound levels. *See* Trial Tr. at 73:6-7 (Wilkerson's counsel explaining to jury that green end "just blocks out … a certain amount of noise"). And even if Wilkerson could have understood the statement that the green end "blocks out everything" literally, he could not have reasonably relied on that statement, as it would have been obvious the first time he used the earplug that the green end did not completely block all noise. *See Malzewski v. Rapkin*, 723 N.W.2d 156, 163 (Wis. Ct. App. 2006) (affirming grant of summary judgment on misrepresentation claim because plaintiffs' reliance on alleged misrepresentation was "not justified").

It is no answer to suggest that the civilian's statement about the proper circumstances in which to use the green and yellow ends implied that the CAEv2 was fit for use on patrol and on the gun range, and that the jury must have concluded it was not. The jury *rejected* Wilkerson's argument that the CAEv2 was not fit for

its intended purposes because the jury ruled for Appellants on Wilkerson's design-defect and failure-to-warn claims. The only misrepresentation theory consistent with the jury's verdict is the one that Wilkerson actually pursued at trial: that even if the CAEv2 were a reasonably safe earplug and Wilkerson had all necessary information to use it effectively, the CAEv2 failed to live up to some additional representation made by Appellants in their advertising or the MPID.

*Third*, even if the statements by the civilian could plausibly be attributed to Appellants and deemed false, the record is clear that Wilkerson did not rely on those statements. Wilkerson used the CAEv2 because it was the earplug the military issued him, not because of anything the civilian presenter said, including that the green end "blocks out everything." Trial Tr. at 1330:2. In denying Appellants' post-trial motion, the district court referenced testimony in which Wilkerson agreed he "was led to believe the earplug provided adequate protection," Dkt.220 at 4, but counsel's leading question drew an immediate objection, and, preempting any ruling from the court, Wilkerson's counsel rephrased and asked whether Wilkerson relied *on the CAEv2* to protect his hearing. Trial Tr. at 1364:10-13. Moreover, the question did not identify *who* led Wilkerson to believe the earplugs would protect his hearing or what, if anything, anyone told Wilkerson. The only conclusion consistent with Wilkerson's testimony is that he believed the CAEv2 would protect his hearing

because he trusted the military to issue him an effective earplug, not because of any statements of fact from the civilian presenter or anyone else.

*Fourth*, even if the statements from the civilian presenter could support Wilkerson's misrepresentation claims, Appellants would be entitled to a new trial because the jury's verdict was almost certainly influenced by the baseless misrepresentation theories that were front and center at trial (as opposed to the district court's *post hoc* "civilian presenter" theory that Wilkerson's counsel did not even press). All agree that Wilkerson never saw or relied upon the "protective up to 190 decibels" statement, the MPID statements, or the NRR of 22. Yet Wilkerson presented hours of testimony on those issues, over Appellants' repeated objections. *See Adkins*.Dkt.49 at 4; pp.17-23, *supra*. During closing argument, Wilkerson expressly based his misrepresentation claims on statements in the MPID and 3M's advertising that he never received. Trial Tr. at 2846:17-2848:16.

The law of this Court is clear that, where "two or more claims are submitted to the jury in a single interrogatory, a new trial may be required if *either* of the claims was erroneously submitted, as there is no way to be sure that the jury's verdict was not predicated solely on the invalid claim." *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1055 (11th Cir. 1994) (emphasis added); *see id*. at 1054 (approvingly citing a case for "reversing and remanding general verdict for a new trial because one of six different misrepresentations making up plaintiffs' fraud claim was improperly

39

submitted to the jury"); *Royal Typewriter Co. v. Xenographic Supplies Corp.*, 719 F.2d 1092, 1099 (11th Cir. 1983). That law fully applies here. At the very least, the jury's verdict *could have* rested (indeed, almost certainly did rest) on the improper misrepresentation theories that were the exclusive focus of Wilkerson's trial presentation, as opposed to the "civilian presenter" theory addressed in the district court's post-trial decision. Judgment as a matter of law is warranted on this record, but at a minimum, there must be a new trial untainted by alleged misrepresentations that Wilkerson never received or relied upon but extensively pressed to the jury.

## II. The District Court Erred By Prohibiting Kevin Michael And Eileen Kline From Testifying.

Kevin Michael and Eileen Kline performed the only other complete, ten-subject ANSI S3.19 test of the CAEv2—and they recorded an NRR of 23, one decibel *more* than the 22 NRR on the product's label that Wilkerson repeatedly urged the jury was fraudulently high. The district court's decision to prohibit Michael and Kline from testifying to the jury about these critical, independent test results defies explanation and was enormously prejudicial. Appellants are entitled to a new trial where they may permissibly tell a jury that an independent laboratory retained by the very competitor who filed the *qui tam* case against Appellants strongly corroborated the veracity of the CAEv2's stated NRR.

The court gave two justifications for prohibiting Michael and Kline from testifying. Neither withstands scrutiny. *First*, the court concluded that, because the

40

reports that Michael and Kline prepared to document their testing were inadmissible hearsay, any testimony about that testing would be "back door hearsay." *Adkins*.Dkt.91 at 5. But separate and apart from any documents, Michael and Kline have *personal knowledge* of the testing on the CAEv2 because they *personally conducted* it. Their knowledge of the testing and the truth of the results they obtained is not derived from the written report that they prepared; on the contrary, they created the report to *document* their personal knowledge of the testing and their results. A police officer is not barred from testifying about events he witnessed just because his incident report is inadmissible. He can testify as to his personal knowledge of the events, and even use his written report to refresh his recollection. *See, e.g.*, *United States v. Wisener*, 494 F.2d 516, 517 (5th Cir. 1974); *United States v. Marrero*, 651 F.3d 453, 471-72 (6th Cir. 2011). So too here. Michael and Kline should have been permitted to provide their personal knowledge of the testing and its results to the jury, even if the out-of-court statements in the written reports were excluded from evidence.

As for the reports themselves, the district court had no coherent explanation why they could not satisfy the business-record exception to the hearsay rule. Fed. R. Evid. 803(6). When the court struck Michael from the witness list the first time, it noted that records prepared "for purposes of litigation" are not eligible for the exception. *Baker*.Dkt.118 at 2 (quoting *United States v. Arias-Izquierdo*, 449 F.3d

1168, 1184 (11th Cir. 2006)). The court acknowledged Michael had previously testified that "he did not know what [Moldex] planned to do with the Test Reports," but nonetheless struck Michael because there was no evidence that the employee who actually conducted the test, Eileen Kline, "was similarly unaware" of the reason for the testing, and Michael "cannot testify as to Kline's knowledge." *Id*. Appellants added Kline to the witness list in the next bellwether trial to fill the gap the district court had identified and to establish that Kline did not know the test she performed on the CAEv2 was intended for use in litigation. But this time, the district court decided—without explanation, and contradicting its prior order—that Kline's testimony could not make any difference to the hearsay question. The court simply asserted that the test reports were "hearsay not within a recognized exception" and determined it had no need to hear from Kline. *Adkins*.Dkt.91 at 5.

*Second*, the district court held that even if the reports had been admissible, Michael and Kline could not personally testify about the testing because Appellants had not designated them as expert witnesses. *Adkins*.Dkt.91 at 5. That reasoning is also flawed; Michael and Kline did not have to be designated as expert witnesses to provide fact testimony about their actual testing of the CAEv2 they performed for reasons having nothing to do with this litigation.

The district court seemed to think that, because the testing implicated "the technical aspects of ANSI S3.19-1974," only an expert witness could discuss it.

*Adkins*.Dkt.91 at 5. That misunderstands the role of an expert witness and the rules governing expert testimony. An expert witness is not distinguished by his ability to present factual testimony concerning technical topics; he is distinguished by his ability to *provide opinions*. Federal Rule of Evidence 701 prohibits lay witnesses from providing testimony "in the form of an opinion," and Rules 702, 703, and 705 explain when an expert should be permitted to provide this otherwise impermissible "opinion" testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." (citation omitted)). Accordingly, Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose "any witness it may use at trial to provide evidence under Federal Rule of Evidence 702, 703, or 705," along with a "complete statement of all opinions the witness will express and the basis and reasons for them." These rules limit a witness's ability to provide opinions on the stand; they do not limit a lay witness's ability to testify regarding personal, case-relevant factual knowledge that implicates technical topics. *See Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009) ("When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702.").

There was no need to disclose Michael and Kline as expert witnesses because they were never going to provide opinions about the testing they performed. Instead, Michael and Kline would have testified to facts within their personal knowledge: how they conducted the test and, most important, what the results were (specifically, the NRR of 23). None of this would have involved the expression of an opinion. It might have required some discussion of the ANSI S3.19 testing standard, but only to explain why Michael and Kline conducted the test the way they did. Michael and Kline were not going to give their opinion of the proper interpretation and application of ANSI S3.19, nor were they going to opine on the efficacy of the CAEv2 or even what an NRR of 23 means. They were simply going to tell the jury that their testing (the only other ten-subject ANSI S3.19 test ever performed on the CAEv2) resulted in an NRR of 23, corroborating the NRR of 22 that Wilkerson and all other bellwether plaintiffs have repeatedly claimed is fraudulent.

The district court's decision to deprive the jury of that testimony was hugely prejudicial to Appellants. In opening statements, Wilkerson's counsel stated: "What you're going to see in the case is that 3M tested the same plug multiple times over the ensuing years, and they never got a 22 again on the green end." Trial Tr. at 93:23-25. Wilkerson's witnesses proceeded to testify that the NRR of 22 was "wrong" and not based on a "valid test," and that it was "not proper" for Appellants to set aside the eight-subject test with its NRR of 11. *Id.* at 361:25-362:1, 758:12, 2842:25. The

44

most powerful rebuttal to those arguments—upon which the jury easily could have rested its misrepresentation verdict—would have been to point out that the only other ten-subject ANSI S3.19 test, which was conducted by an independent lab working for 3M's competitor, found an even *higher* NRR of 23. Two witnesses were prepared to give that testimony, but the district court forbade them from appearing. A new trial is warranted before a jury informed of this critical evidence supporting the NRR of 22.

## III. Numerous Evidentiary Issues Require A New Trial.

Evidentiary and legal errors permeated this trial and all the bellwether trials. As noted, the proceedings were fundamentally skewed by Appellants' inability to present their central government-contractor defense to the jury or explain that federal law imposes no labeling or instructional directions for equipment used in combat. As a result, the jury received a fundamentally skewed version of the role of the military and Appellants' legal responsibility to provide directions and other representations about the CAEv2. But even beyond these pervasive errors that permeated every bellwether trial, Wilkerson introduced inadmissible and highly prejudicial evidence throughout trial to support his theory that Appellants had somehow misled the military about the CAEv2. Each of those errors independently supports a new trial, and their cumulative effect compels one.

45

### A.  Communications Regarding the Discontinuation of the CAEv2 Should Have Been Excluded.

Appellants were severely prejudiced by the erroneous admission of the 2015 email from the business director of 3M's hearing protection division, Bryan Myers, stating "[w]e cannot ship any further products with current labeling" and "we cannot distribute this with the current NRR on the package," which Wilkerson used to argue that the NRR of 22 was false.  P-Gen-128 at 1, 3.  As the district court itself held, the bulk of the email is "plainly" inadmissible because it relates to the discontinuation of the CAEv2, which qualifies as a subsequent remedial measure. Dkt.1693 at 12-13; *see* Fed. R. Evid. 407.  The court nevertheless justified allowing the two statements at issue—which happened to be the most prejudicial of all— because they supposedly are "not intertwined with discontinuation, nor do they lead to the conclusion that the product was discontinued." *McCombs*.Dkt.105-1 at 7.

Respectfully, that reasoning does not pass the straight-face test.  The two statements are as intertwined with the discontinuation decision as it gets.  They are the very *reasons* the business director gave for cancelling the orders of the CAEv2. And the statements themselves refer to ceasing all shipments of the earplugs. Deeming those statements "not intertwined" with the discontinuation is akin to saying an appellate decision's reasoning is "not intertwined" with its disposition of the appeal.

### B.    The *Qui Tam* Report Should Have Been Excluded.

The district court recognized that the *qui tam* report—with its prejudicial statement that "had [the interviewees] known about the February 2000 test results … they may not have purchased the [CAEv2]"—is hearsay.  P-Gen-10 at 7. The court nevertheless admitted the summary of the investigator's interviews on the ground that it was a factual finding and thus satisfied the public-records exception. Fed. R. Evid. 803(8).  But the investigator made clear at her deposition that she had not made any factual findings at all.  On the contrary, she agreed that she was "just summarizing what other people told [her]" and had not made any credibility or reliability determinations.  Coleman Dep. Tr. at 236:11-17, 465:4-7.  The summary simply repeated the interviewees' statements, which the district court correctly excluded as "inadmissible hearsay within hearsay."  Dkt.1693 at 8.  If the underlying statements are excluded, then the investigator's summary of those statements is still hearsay-within-hearsay and must be excluded as well.    Placing "otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009); *see also id.* ("Hearsay within hearsay subject to an exception is not admissible.").

The *qui tam* report's implication that the military would not have purchased the CAEv2 if it knew about Aearo's first test of the earplug bolstered Wilkerson's

allegation that Myers made a false representation to the government when he told a DLA official that Aearo had tested the CAEv2 "only once." P-Gen-94. If Myers had told the military about the test that was stopped after eight subjects, Wilkerson argued, then the military might not have purchased the earplugs, and Wilkerson might not have suffered any injuries to his hearing. As explained above, this misrepresentation theory is entirely inappropriate and never should have been submitted to the jury because Wilkerson never knew about this statement by Myers. But even if the theory were valid, Wilkerson should not have been permitted to use the *qui tam* report's summary of hearsay statements to support his assertion that the military did not know about the first test and would have rejected the CAEv2 if it did know. Wilkerson should have to prove that point himself, rather than relying on hearsay masquerading as an official statement of fact.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court, or at a minimum vacate the judgment and remand for a new trial.

Respectfully submitted,

/s/Paul D. Clement

GEORGE W. HICKS, JR.                  PAUL D. CLEMENT
KASDIN M. MITCHELL                      *Counsel of Record*
KIRKLAND & ELLIS LLP                  CLEMENT & MURPHY, PLLC
1301 Pennsylvania Avenue, NW          706 Duke Street
Washington, DC 20004                  Alexandria, VA 22314
(202) 389-5000                        (202) 742-8900


COLE CARTER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

*Counsel for Defendants-Appellants*

November 8, 2022

49

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,654 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

November 8, 2022

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement